UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER R. JORGENSEN,

    *Plaintiff*,

v.                                                              CASE NO. 2:13–CV–11765-NGE–PTM

COMMISSIONER OF                          DISTRICT JUDGE NANCY G. EDMUNDS
SOCIAL SECURITY,                          MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.
_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB")

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

and Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 14, 15.)

Plaintiff Amber Jorgensen was 27 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 33.) Plaintiff's past work was sporadic, lasting for between one and ten months at a time, as a cashier, and customer service representative. (Tr. at 169.) Plaintiff filed the present claims on October 20, 2010, and November 9, 2010, alleging that she became unable to work on March 3, 2010. (Tr. at 146, 148.) The claims were denied at the initial administrative stages. (Tr. at 92, 93.) In denying Plaintiff's claims, the Commissioner considered anxiety related disorders and disorders-female genital organs. (Tr. at 92, 93.) On May 16, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Michael Wilenkin, who considered the application for benefits *de novo*. (Tr. at 9-22, 30-65.) In a decision dated February 14, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 18.) On April 19, 2012, Plaintiff requested a review of this decision. (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on February 14, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On April 19, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.     Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990), *superseded by statute on other*

*grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the Social Security Agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

credibility'") (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record before the ALJ only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

4

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available

only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her

6

past relevant work . . . ." *Jones*, 336 F.3d at 474, *cited with approval in Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements at all times pertinent through March 13, 2011, and that Plaintiff had not engaged in substantial gainful activity since March 3, 2010, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's endometriosis, tonsillitis, and panic and adjustment disorders were "severe" within the meaning of 20 C.F.R. § 404.1520. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 17.) The ALJ also found that Plaintiff was 27 years old, which is a younger individual under 20 C.F.R. § 404.1563. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 16-17.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 17-18.)

E.	**Administrative Record**

The relevant medical evidence contained in the administrative record indicates that Plaintiff was treated in the emergency room of the Mount Clemens Regional Medical Center from 2008-2011. (Tr. at 214-37, 290-349, 430-43.) On December 4, 2008, Plaintiff went for care based on her abdominal pain and told staff that she had "a miscarriage 2 months ago, but did not go to the hospital or a doctor. Then last month here menses lasted only 1 day. Started vag bleeding yesterday." (Tr. at 214.) An ultrasound of Plaintiff's pelvis and transvaginal studies taken that day were "normal." (Tr. at 217-19.) Plaintiff was diagnosed with "dysmenorrhea" and was discharged "feel[ing] better." (Tr. at 215.)

On April 20, 2010, Plaintiff presented to the emergency room because of nausea and vomiting, she was diagnosed with "hyperemesis gravidarum[,] [c]onstipation[,] [and] [a]bdominal pain probably secondary to pregnancy" and was released. (Tr. at 227-28.)

On August 1, 2010, Plaintiff sought treatment because her "belly hurts" and she was "bleeding." (Tr. at 235-37.) Plaintiff was diagnosed with "[d]ysfunctional uterine bleeding" and "[e]ndometriosis." (Tr. at 235.)

Plaintiff was also treated at Henry Ford Hospital, Macomb, from 2007 to 2010. (Tr. at 238-71, 416-20.) On April 18, 2008, x-rays of Plaintiff's chest and abdomen showed "scoliosis" but also showed a normal heart and gastrointestinal system. (Tr. at 255.) On December 8, 2008, x-rays of Plaintiff's chest and abdomen showed "scoliosis." (Tr. at 249.) On July 27, 2010, a CT scan of Plaintiff's abdomen and pelvis were negative and normal except for "[m]ild fecal stasis" and a "small amount of free fluid in the pelvis, likely physiologic." (Tr. at 239, 241.)

8

Plaintiff treated with Michigan Neurology Associates, P.C., specifically, Sheetal Varde, D.O., for anxiety and lumbago/cervicalgia, in 2010-2011. (Tr. at 272-89, 444-53.) On March 9, 2010, Dr. Varde noted that Plaintiff received "trigger point injections into her neck and shoulder region, and that has been somewhat helpful." (Tr. at 277.) On May 11, 2010, Plaintiff underwent an EEG which was "normal[.]" (Tr. at 281.) An MRI of Plaintiff's brain taken that day was normal other than a "pineal cyst is noted in the midline." (Tr. at 286-87.) In addition, an MRI of the cervical spine was normal other than "at the C6-C7 disc level, diffuse posterior disc bulging is accompanied by thin broad based disc herniation in the midline which does not produce spinal stenosis." (Tr. at 288-89.)

On June 14, 2010, Dr. Varde noted that Plaintiff was "very interested in trying to get pain medications" and that Dr. Varde "advised I would like ascertain exactly what her issues are and that these medications have a potential for addiction." (Tr. at 274.)

On June 18, 2010, an MRI of Plaintiff's thoracic spine was normal other than a "small disc herniation at the C6-7 disc space, which does not produce spinal stenosis." (Tr. at 282-83.) On the same day, an MRI of the lumbar spine showed "[m]ild scoliosis without evidence of acute fracture or spondylolisthesis" and "no evidence of disc herniation or spinal stenosis and the neural foramen are patent bilaterally." (Tr. at 284.)

On July 27, 2010, a CT scan of Plaintiff's abdomen was normal other than "[m]ild fecal stasis." (Tr. at 395.)

A pelvic ultrasound taken on July 31, 2010, was "unremarkable[.]" (Tr. at 326.)

On August 17, 2010, Dr. Varde noted that Plaintiff was "still having episodes of lightheadedness and dimming vision, but no episodes of syncope." (Tr. at 272.) Dr. Varde

9

recommended physical therapy and indicated Plaintiff should "avoid heavy pushing, pulling and/or lifting." (Tr. at 273.)

On August 17, 2010, a medical examination report was completed which found Plaintiff to be within normal limits in all areas except that she had decreased sensation distally and was depressed but found her condition to be stable. (Tr. at 351.)

Plaintiff also sought treatment with the Digestive Health Center of Michigan in 2010. (Tr. at 363-77.)

Plaintiff was treated at the Chesterfield Family Care in 2010. (Tr. at 378-415.) On November 16, 2010, Plaintiff underwent a colonoscopy which was "[n]ormal[.]" (Tr. at 392.) On November 17, 2010, x-rays of Plaintiff's chest were "[n]egative." (Tr. at 391.)

On January 6, 2011, Plaintiff underwent a consultative neurological examination with Alicia Lumley, M.D. who found Plaintiff's gait was normal, her strength was 5/5 bilaterally, and all was normal other than Plaintiff's mood was "down." (Tr. at 424-25.)

Plaintiff underwent a consultative examination ("CE") with Atul Shah, M.D., Psychiatrist, on January 13, 2011. (Tr. at 426-29.) Dr. Shah found Plaintiff was oriented times three, had "good contact with reality[,]" and fair insight but concluded that she has "moderate to severe functional impairment for occupational activity because of panic disorder with agoraphobia, which interferes with her ability to interact with the public, coworkers and family members" and noted that she is "subject to relapses in view of the lack of psychiatric intervention." (Tr. at 428.) Dr. Shah assessed a GAF score of 60 and gave Plaintiff a fair prognosis. (*Id.*)

10

Plaintiff sought treatment with Catholic Services of Macomb and Nouha Alammar, D.O. in 2011. (Tr. at 454-69.)

Plaintiff was counseled at the Pioneer Counseling Center in 2011. (Tr. at 477-87.) Plaintiff's therapist noted that Plaintiff's gait, posture, and motor activity were normal, that her productivity was spontaneous, her progression circumstantial, her language age appropriate, her emotional tone labile and anxious, affect appropriate, mental trend and content of thoughts unremarkable, orientation alert, accurate, memory intact, and insight and judgment fair. (Tr. at 486.)

Plaintiff sought treatment at the Macomb Cardiovascular Group in 2011. (Tr. at 488-502.) On September 28, 2011, Timothy Logan, D.O, summarized that Plaintiff had an "extensive workup that has not uncovered any clear cardiac etiology" so he recommended a "Loop recorder" be used to "uncover any significant cardiac dysrhythmias" and Dr. Logan indicated that he would "see her again in the office in six months." (Tr. at 488.)

At the administrative hearing, Plaintiff testified that she lives with her five year-old son in a two-story townhouse. (Doc. 33.) Plaintiff stated that she has a driver's license but does not drive because her doctor told her she should not until after she has gone six months without a syncope event. (Tr. at 34.) Plaintiff testified that she could not stay at her past jobs because "my anxiety and my dizziness and my stomach pain and my back pain. I couldn't stand those long hours." (Tr. at 35.) When asked by the ALJ why her jobs didn't last, Plaintiff responded, "because of the mental issues I've been having, the anxiety, panic attacks, agoraphobia, depression. Also the stomach pain, back pain, from the endometriosis and sometimes my legs go numb and then I'll have headaches." (*Id.*) After learning that Plaintiff does not like working with people, the ALJ asked Plaintiff whether she had ever tried jobs that have minimal contact with people and Plaintiff responded, "I can't imagine any job

11

that wouldn't involve people because any job does involve people." (Tr. at 36.) Plaintiff stated that she has panic attacks in "[v]ery stressful situations...when I'm surrounded by a lot of people or when something bad happens or I see it as something bad, like a death or basically an overload of emotions." (Tr. at 37.) Plaintiff indicated that she has panic attacks once or twice a week but that it "has gotten better over the past month or two." (Tr. at 37-38.)

Plaintiff testified that she stopped treating with her psychiatrist in 2011 because she "was not comfortable" with her and that Plaintiff has seen several counselors and psychiatrists but did not stay with them because she is "not a people person." (Tr. at 39-40.) Plaintiff stated that her prescription medications do not "take away" the anxiety but "will clam [her] down from a panic attack." (Tr. at 42.)

Plaintiff indicated that she has had abdominal pain since her son was born in 2006 and that she has undergone injections and has taken medication for the pain caused by endometriosis but that her "stomach still does hurt." (Tr. at 43.) Plaintiff added that the pain "wakes me up at night" and that "throughout the day[,] [l]ike I said, most of the time I spend laying down." (Tr. at 43-44.) Plaintiff stated that she did not want to have a hysterectomy "until [she] get[s] clearance from [her] cardiologist." (Tr. at 44.)

Plaintiff stated that her back and leg pain are provoked by "[w]alking or sitting for too long, standing." (Tr. at 46.) Plaintiff further stated that she spends "most of my time laying down. I can't walk more than half a block. I can't stand longer than three to five minutes. And sitting is 15 to maybe a half hour. And then I have to lie down." (*Id.*) Plaintiff indicated that she "can't do barely any of those" postural activities such as stooping, squatting, kneeling and crouching. (Tr. at 46-47.)

Plaintiff testified that "[t]hey've tried medications and everything, but up until I get everything cleared away with the cardiologist, I can't take any type of medications. I haven't had physical therapy for it or anything. I have to wait until I find out if I am allowed to do anything physical." (Tr. at 47.)

Plaintiff stated that the other problems that keep her from working are anxiety, depression, agoraphobia, dizziness, syncope, abdominal pain and shoulder pain. (Tr. at 47-48.) Plaintiff explained that she her dizziness occurs "right before I pass out, where everything starts to move and the sides of my vision start dimming to black" and that her lightheadedness occurs when her "heart beats really fast" and she is "sweating" and she "feel[s] like I'm going to pass out and my heart beats fast." (Tr. at 48.) Plaintiff indicated that these are the result of "tachycardia, the heart issue, and the mental problems. They come hand in hand." (Tr. at 49.) When asked whether her heart condition had been addressed or diagnosed by her doctor, Plaintiff responded, "Addressed in 2011. And we're still going through the diagnostic process. They've already diagnosed tachycardia." (*Id.*)

Plaintiff testified that she does her own household chores but that she "can only do it for about five to ten minutes, and then I have to lay down...after I lay down for a couple hours, if I start feeling better, I might go back to it." (Tr. at 52.) Plaintiff also stated that she "like[s] to read but I can't sit and read for too long...My concentration doesn't stay focused because of my stomach and my back hurts." (*Id.*) Plaintiff estimated that she spends "more than half the day, about three quarters of the day" "lying down." (*Id.*)

The ALJ asked the vocational expert ("VE") at the hearing to consider an individual with Plaintiff's background who:

> is able to sit six of wight hours of an eight-hour workday, stand or walk two of wight hours of an eight-hour worday. Lift as much as ten pounds only occasionally and lesser weights somewhat more frequently. You may assume history of what is described as intractable if not refractory dizziness or light headedness, the precise etiology of which is unclear. Apparently, the symptom picture is complicated by episodes of syncope to the extent that she occasionally ostensibly loses consciousness. Assume for purposes of this query that while these episodes tend to happen, they do not occur to the degree of frequency and intensity and assuredness that would be incompatible with functioning in the manner I suggest. The record does describe some cardiac investigation that is - - thus far have been less than positively revealing. There is suspicion for possible tachycardiac syndrome, possible orthostatic component to some of these symptoms but it's not yet established with any degree of certitude. otherwise, there doesn't appear to be any other significant cardiac pathology of moment enough or symptomatic presentation that would be incompatible with functioning in the manner I suggested.

13

> The record reflects a history of complainant pain and discomfort in the neck and lower back. The precise ideology for these symptoms is mildly speculative. Primarily it seems soft tissue in origin. Record does not reveal any definitive, significant neurological component. Be that as it may, the record does suggest some history of complaint in this regard. And it is of sufficient consequence to at least limit her to the extent described in my initial assessment of function. Considering all of these things together, it would be advisable that the hypothetical individual avoid anything requiring - - any job description that would require repetitive stooping, squatting, kneeling, crouching, bending, twisting or torqueing on the neck or lower back. She should also avoid repetitive climbing of stairs, ladders, scaffolding, or some such, prolonged or protracted walking would be contraindicated just as well. The record reveals a history of psychiatric or psychological difficulties, manifesting in the form of the limits of depression, anxiety, even elements of panic. In this regard, the hypothetical individual would be limited to performance of work activities which allow for no contact with the public. So, too contact with coworkers and supervisory personnel should be kept to a minimum. Not contraindicated completely but should be kept to a minimum. She should not be required to perform work activities where in the pace of the work's productivity is dictated by an external source over which she has no control, such as an assembly-line or conveyer built [sic], as she should be allowed to work at a piece-rate vocation that would allow her to function pretty much as her own pace. Being allowed to do so, she should be able to meet at least daily production requirements and standards. Lastly - - well, no, not lastly. In this regard, what I'm suggesting is she should be limited to relatively simple, routine, repetitive tasks, not involving the exercise of significant, independent judgment. And for that matter, even marginal independent judgment. Lastly, the deficits suffered and/or the modalities employed to treat the same do not warrant that the hypothetical individual lie down or otherwise be recumbent during the course of a typical workday.

(Tr. at 60-62.) The VE responded that such a person could not return to any of Plaintiff's prior work but could unskilled, simple, repetitive perform sedentary work, i.e., the 7,500 visual inspector, final assembler, sorter jobs available in the Detroit area and 15,000 available in the State of Michigan. (Tr. at 62-63.) In addition, the VE indicated that half of these jobs would allow for a sit/stand option. (Tr. at 63.) The VE also testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") except that the DOT does not address sit/stand options. (*Id.*)

### F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 16-17.)

14

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10, 1983 WL 31251, at *5.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Docs. 10, 15.) As indicated above, if the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

15

Specifically, Plaintiff argues that the ALJ's "RFC assessment and hypothetical were fatally inconsistent" and that the ALJ's 'decision further fails to adequately account for the limitations necessitated by plaintiff's episodes of dizziness and syncope." (Doc. 10 at 11, 13; Doc. 15 at 5, 7.)

I first suggest that the ALJ's hypothetical is not fatally inconsistent as Plaintiff argues. (Doc. 10 at 11-12.)   As to this topic, the ALJ stated:

> She should not be required to perform work activities where in the pace of the work's productivity is dictated by an external source over which she has no control, such as an assembly-line or conveyer built [sic], as she should be allowed to work at a piece-rate vocation that would allow her to function pretty much as her own pace.  Being allowed to do so, she should be able to meet at least daily production requirements and standards.

(Tr. at 61-62.)  It is not inconsistent to find that although Plaintiff could meet the production requirements for an ordinary job where some productivity is needed but where she could work primarily at her own pace, she could not perform activities where productivity is paramount, such as an assembly-line of conveyer belt type job.  I therefore suggest that this argument lacks merit.

In addition, I suggest that the ALJ's hypothetical adequately accounted for Plaintiff's dizziness and syncope since the ALJ specifically included, in the hypothetical, that "[y]ou may assume history of what is described as intractable if not refractory dizziness or light headedness...[and that] the symptom picture is complicated by episodes of syncope to the extent that she occasionally ostensibly loses consciousness" and asked the VE to "[a]ssume for purposes of this query that while these episodes tend to happen, they do not occur to the degree of frequency and intensity and assuredness that would be incompatible with functioning in the manner I suggest." (Tr. at 60.)  I

16

therefore suggest that the ALJ considered and included Plaintiff's dizziness and syncope in the RFC findings.

I further suggest that the ALJ's RFC findings are supported by substantial evidence. There is simply no objective medical evidence supporting disability. X-rays, CT scans and MRIs showed "mild" scoliosis and some disc bulging at C6-C7 without stenosis, but no other evidence of spinal issues that could produce disabling symptoms. (Tr. at 249, 255, 282-84, 288-89.) Although Plaintiff was diagnosed with endometriosis, CT scans of her abdomen and pelvis were consistently negative and normal except for "[m]ild fecal stasis" and a "small amount of free fluid in the pelvis, likely physiologic." (Tr. at 239, 241, 326, 392, 395.) In addition, by August 17, 2010, Plaintiff reported she was not having any episodes of syncope. (Tr. at 272.)As to psychiatric impairments, there was also no evidence of disabling symptoms and the symptoms Plaintiff reported were included in the ALJ's RFC findings. Finally, as to potential cardiac impairment, Dr. Logan summarized that Plaintiff had an "extensive workup that has not uncovered any clear cardiac etiology." (Tr. at 488.)

I therefore suggest that the ALJ's RFC findings are supported by substantial evidence and should not be disturbed.

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

Date: May 27, 2014 /S PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system, which automatically delivers a copy to counsel of record. I further state that a hard copy was served on District Judge Edwards in the traditional manner.

Dated: May 27, 2014 s/*Jean L. Broucek*, Case Manager

18